# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 23-cv-60031-ALTMAN/Reinhart

**NEAL SEAN FAGAN**,

      *Petitioner*,

*v.*

**U.S. ATTORNEY GENERAL**,

      *Respondent.*

_____/

## ORDER ADOPTING
## MAGISTRATE JUDGE'S REPORT & RECOMMENDATION

Our Petitioner, Neal Sean Fagan, seeks "review of an order of the Board of Immigration Appeals [('BIA')] dismissing his appeal of the immigration judge's (a) denial of his motion to terminate removal proceedings and (b) finding that he was removable under former [Immigration and Nationality Act ('INA')] § 237(a)(2)(A)(ii)." Eleventh Circuit Order [ECF No. 1] at 1. Fagan—who is currently under an order of deportation—asks us to declare that he's "a United States Citizen based on the concept of derivative citizenship established by former INA § 321(a), 8 U.S.[C.] §§ 1432(a)." *Ibid.*

In 2018, the U.S. Citizenship and Immigration Services ("USCIS") denied Fagan's application for naturalization, and the BIA denied his appeal. *See* USCIS Decision on Fagan's Form N-600 Application for Certificate of Citizenship ("USCIS Decision") [ECF No. 45-14]; BIA December 20, 2019, Decision [ECF No. 45–18]. Fagan appealed to the Eleventh Circuit, which transferred the appeal to us for a *de novo* determination of whether Fagan is, in fact, a U.S. citizen. *See generally* Eleventh Circuit Order. The parties filed cross-motions for summary judgment. *See* Plaintiff's Motion for Summary Judgment ("Fagan's MSJ") [ECF No. 48]; Government's Motion for Summary Judgment ("Govt's MSJ") [ECF No. 49].

We referred the matter to U.S. Magistrate Judge Bruce E. Reinhart for a Report and Recommendation. *See* Scheduling Order and Order of Referral [ECF No. 62]. Magistrate Judge Reinhart found that Fagan *isn't* a U.S. citizen and suggested that we grant the Government's MSJ and deny Fagan's. *See* Report and Recommendation Regarding the Parties' Cross Motions for Summary Judgment ("R&R") [ECF No. 63] at 1. Fagan filed objections to the R&R, *see* Plaintiff's Objections to the Report and Recommendation ("Objections") [ECF No. 82], and the Government responded to those Objections, *see* Response to Petitioner's Objections to the Report and Recommendation ("Response") [ECF No. 84]. After careful review, we **OVERRULE** Fagan's Objections, **ADOPT** the R&R in full, **GRANT** the Government's MSJ, and **DENY** the Petitioner's MSJ.

## THE FACTS[1]

Fagan was born in Jamaica on February 24, 1969, to unmarried parents, Amy DeHaney and Gustavus Fagan. *See* Joint Stipulation of Facts ("Joint SOF") [ECF No. 44] ¶¶ 1–3, 5. Neither Ms. DeHaney nor the elder Mr. Fagan were U.S. citizens at the time of our Fagan's birth. *Id.* ¶ 4. Fagan has never been in his father's legal custody and has no bona fide parent-child relationship with him. *Id.* ¶ 6.

"Ms. DeHaney was admitted for lawful permanent residence in the United States on April 20, 1974" on an SA-1 special immigrant visa. *Id.* ¶ 7; *see also* DeHaney Immigration Visa and Alien Registration [ECF No. 46-5] (showing a "Classification Symbol" of "SA-1" and listing "Western Hemisphere" as the "foreign State/Other Area Limitation"). In her SA-1 visa application, Ms.

---

[1] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up). In adjudicating cross-motions, then, we consider each motion separately and, of course, resolve all reasonable inferences against the movant. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

DeHaney listed Fagan as her son but indicated that he "(will not) accompany or follow me to the United States." DeHaney's Form FS-510, Application for Immigrant Visa ("DeHaney Visa Application") [ECF No. 45-10]. Fagan appears to have remained in Jamaica while his mother emigrated to America.

Two years later, on January 20, 1976, six-year-old Fagan arrived in the United States. *See* Joint SOF ¶¶ 8–9. The record contains a Form I-94 arrival/departure record,[2] which shows that a B-2 visitor visa[3] (the "B-2 Visitor Visa") was issued to Fagan on that day. *See* Form I-94 Record [ECF No. 43-4]. The B-2 Visitor Visa allowed Fagan to stay in the United States until April 3, 1976. *See ibid.* But it did *not* confer lawful permanent resident ("LPR") status on Fagan and was *not* connected to Ms. DeHaney's visa. The Form I-94 arrival/departure record that was created when Fagan entered the United States includes the following stamp: "ADMITTED B-2 (CLASS) UNTIL 4/3/76." Form I-

---

[2] The Form I-94 is Fagan's record of arrival and departure. "Form I-94 is the DHS arrival/departure record issued to aliens who are admitted to the U.S., who are adjusting status while in the U.S. or extending their stay, among other uses. A CBP officer generally attaches the I-94 to the non-immigrant visitor's passport upon U.S. entry. The visitor must exit the U.S. on or before the departure date stamped on the I-94." *I-94 Fact Sheet*, U.S. CUSTOMS AND BORDER PROT., (https://www.cbp.gov/document/fact-sheets/i-94-fact-sheet (Sept. 30, 2025). Under FED. R. EVID. 201, we "may take judicial notice of government publications and website materials." *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018) (Dimitrouleas, J.); *see also Douzable v. NewRez, LLC*, 2019 WL 8888210, at *1 (S.D. Fla. Oct. 10, 2019) (Altman, J.) ("Since this document is publicly available on the CFPB's website, the Court may take judicial notice of its contents."); *Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, 2017 WL 3503371, at *7 (S.D. Fla. Aug. 15, 2017) (Scola, J.) (recognizing that a court may take "judicial notice of information publically [sic] available from an official government website"); *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111–12 (S.D. Fla. 2022) (Graham, J.) ("Several district courts within the Eleventh Circuit have taken judicial notice of USCIS decisions and other information readily available on the websites of government agencies, finding such information was not subject to reasonable dispute and was capable of accurate and ready determination.").

[3] "Visitor visas are nonimmigrant visas for persons who want to enter the United States temporarily for business (B-1 visa), for tourism (B-2 visa), or for a combination of both purposes (B-1/B-2 visas)." *Visitor Visas*, U.S. DEP'T. OF STATE, https://travel.state.gov/content/travel/en/us- visas/tourism-visit/visitor.html/va (last visited Oct. 14, 2025); *cf. Setai Hotel*, 2017 WL 3503371, at *7 (recognizing that a court may take "judicial notice of information publically [sic] available from an official government website").

94 Record; *see also* The Government's Statement of Material Facts ("Government SOF") [ECF No. 49-2] ¶ 14.

Fagan doesn't disagree that he was issued the B-2 Visitor Visa when he entered the United States, and he doesn't dispute the contents of that visa. *See generally* Objections. But he *does* dispute the validity of that visa and whether he was admitted under that visa. *See id.* at 7 ("As a matter of law, the facts before the Court do not establish that Mr. Fagan was eligible for or entitled and eligible to obtain a B-2 non-immigrant visa at the time of his entry, nor do they demonstrate that he was lawfully admitted to the United States in such a status."). And he *does* insist that he was authorized to enter (and remain in) the United States under his mother's immigrant visa. *See ibid.* ("Mr. Fagan's admission on January 20, 1976, aligns with the statutory and regulatory provisions entitling him to follow to join his mother as a lawful permanent resident."). Unfortunately for Fagan, the only document in our record that demonstrates his authorization to enter the United States is the Form I-94 Record, which shows that he was admitted in 1976 on the B-2 Visitor Visa. *See* Form I-94 Record ("ADMITTED B-2 (CLASS) UNTIL 4/3/76"). And Fagan hasn't adduced *any* evidence that he was issued an immigrant visa, that he received LPR status under his mother's visa, or that he entered the United States under his mother's visa. *See generally* Docket.

"On April 29, 1985, Ms. Dehaney applied for naturalization for herself[.]" R&R at 8 (first citing Joint SOF ¶ 10; and then citing Fagan Statement of Material Facts ("Fagan SOF") ¶¶ 29–30).[4] At the same time, she filed a petition for Relative Immigrant Visa ("1985 Relative Immigrant Petition Form I-130") on Fagan's behalf. *See* Joint SOF ¶ 13; *see also* R&R at 8 ("On April 29, 1985, Ms.

---

[4] Fagan's alien file doesn't contain the original petition (or any copy of it). *See* Joint SOF ¶ 8. In his Objections, Fagan complains that the Government shouldn't be allowed to benefit from its failure to maintain his application. But he doesn't explain how that document would change our analysis. And, in any event, "the burden is on the alien applicant to show his eligibility for citizenship in every respect," and all "doubts should be resolved in favor of the United States and against the claimant." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967) (cleaned up).

DeHaney applied for naturalization for herself and filed a petition for Relative Immigrant Visa on behalf of Mr. Fagan."). On May 29, 1985, the Government approved Fagan's 1985 Relative Immigrant Petition Form I-130. *See* Joint SOF ¶ 14; *see also* R&R at 8 ("On May 29, 1985, the Government approved Mr. Fagan's Petition for Relative Immigrant Visa." (first citing Fagan SOF ¶ 32; and then citing 1985 Approval of Form I-130 [ECF No. 45-3])). The approval reads, in pertinent part, as follows:

> The visa petition you filed has been approved. The beneficiary for whom you filed has been given the appropriate classification. **Note the approval gives no assurance that the beneficiary will automatically be found eligible for** visa issuance, admission to the United States or **adjustment to lawful permanent resident status**. Whether the beneficiary gets a visa is decided on when an application is made to a consular officer, **whether the beneficiary is admitted or adjusts status in the United States is decided only when an application is made to an immigration officer**.

1985 Approval of Form I-130 (emphasis added).

The 1985 Approval of Form I-130 specifically informed Fagan that it did *not* confer LPR status and that it was *only* intended to inform Fagan of his eligibility to *apply* for LPR status. Two years later, on January 30, 1987, Ms. DeHaney filed a Form I-485 Application for Permanent Residence on behalf of seventeen-year-old Fagan, who signed that application under penalty of perjury.[5] *See* Form I-485 Application for Permanent Residence ("1988 Form I-485 LPR Application") [ECF No. 45-4]. Among other questions, that application asked: "On what date did you last enter the U.S." and "In what status

---

[5] On Fagan's Application for Permanent Residence, Fagan signed the following certification statement: "I certify, under penalty of perjury under the laws of the United States of America, that the above information is true and correct." Form I-485 Application for Permanent Residence ("1988 Form I-485 LPR Application") [ECF No. 45-4] at 4. Amy DeHaney also attested to the following: "I declare that I prepared this document at the request of the person above and that it is based on all information of which I have any knowledge." *Ibid.* Fagan doesn't argue that his statements shouldn't be considered admissions because he was seventeen when he signed the application, and he doesn't deny that he in fact signed under penalty of perjury. Fagan also doesn't contend that the statements in his 1988 Form I-485 LPR Application are incorrect or that they shouldn't be imputed to him because his mother filled out the application for him. We'll therefore treat the application as having been signed by *both* DeHaney and Fagan under penalty of perjury.

did you last enter the U.S." *Id.* at 2. In response, Ms. DeHaney wrote: "Jan. 20. 1976" and "Visitor," respectively. *Ibid.*

Fagan turned eighteen on February 24, 1987. *See* Joint SOF ¶ 1. On January 29, 1988, Fagan received approval to become a lawful permanent resident. *See* 1988 LPR Approval [ECF No. 45-5]. The 1988 LPR Approval was stamped with "temporary evidence of lawful admission for permanent residence valid until July 28, 1988 Employment Authorized," which served as Fagan's temporary permanent residence card. *Ibid.* Fagan later received a permanent resident card that made clear he was an LPR since January 29, 1988. *See* 1988 LPR Card [ECF No. 45-8] at 4 (listing "Adjustment Date" and "01 29 1988[.]").

All was well for twenty-two years. But, in 2010, Fagan replaced his permanent resident card. *See* Joint SOF ¶ 24; *see also* 2010 LPR Card [ECF No. 45-9]. And Fagan's *new* card read: "Resident 01/20/1976." *Id.* ¶ 25. Fagan now alleges that this 2010 LPR Card incontrovertibly shows that he was an LPR since 1976. *See* Objections at 5. "The Government says the 1976 date on the card was a typographical error." R&R at 15; *see also* Government SOF ¶ 31. Fagan doesn't point to anything else—other than the 2010 LPR Card itself—to support his view.

In February 2012, "Fagan was convicted of conspiracy to commit wire and mail fraud and four counts of mail fraud." R&R at 10 (citing Joint SOF ¶ 6). Fagan was sentenced to 90 months in prison—to be followed by three years of supervised release. *See* Fagan's Amended Judgment in a Criminal Case [ECF No. 45-28]. Fagan applied for naturalization in 2016. *See* Form N-600 Application for Certificate of Citizenship [ECF No. 43-25]. That 2016 application asked: "This application is being filed based on the fact that:" and Fagan checked the box stating: "I am a BIOLOGICAL child of a U.S. citizen parent(s)." *Id.* at 2. Specifically, in "Part 4. Information About Your U.S. Citizen Biological Mother," the application asked: "My mother is a U.S. citizen by," and Fagan checked: "Naturalization." *Id.* at 6. Fagan listed her "Date of Naturalization" as "07/03/1986[.]" *Ibid.* For his

own immigration information, Fagan checked "I am a Permanent Resident" and listed "01/29/1988" as the "Date I became a permanent resident[.]" *Id.* at 4 Fagan listed his "Date of Entry" into the United States as "01/20/1976[.]" *Id.* at 3. Neither party disputes that Fagan entered the United States on January 20, 1976, *see* Joint SOF ¶ 8; that Fagan's mother naturalized on July 3, 1986, *see id.* ¶ 11; or that Fagan was approved for permanent residence on January 29, 1988, *see id.* ¶ 21.

> In 2018, USCIS denied Fagan's application as follows:
>
> On January 23, 2017, USCIS received your Form N-600. You claim that you have acquired U.S. citizenship through your USC mother who became United States Citizen on July 03, 1986. You were born on February 24, 1969 in Jamaica, and became a legal Permanent Resident on January 29, 1988, by that time you were 18 years old. . . . Therefore, you are ineligible for a certificate of citizenship under former INA 321.
>
> You are also ineligible for citizenship under the Child Citizenship Act of 2001 (INA 320), which provides for automatic acquisition of United States citizenship when at least one parent is a citizen of the United States, the child is a permanent resident under the age of 18, and the child is residing in the United States in the legal and physical custody of the citizen parent. However, you must have been under age 18 on the effective date of enactment, February 27, 2001. Because you were over 18 years old on February 27, 2001, you are also ineligible for citizenship under INA 320.
>
> Based on a review of your application, supporting documentation, and information in the record, USCIS has found that you are not eligible for a Certificate of Citizenship under former section 321 of the INA and under section 320 of the INA.

USCIS Decision at 3 (cleaned up). In other words, USCIS concluded that Fagan couldn't have acquired derivative citizenship through his mother.

Given this USCIS denial, once Fagan was released from federal prison, the Government began removal proceedings against him. *See* Deportation Notice to Appear [ECF No. 45-11]. Fagan contested those removal proceedings, and USCIS re-evaluated his application for citizenship. *See* Immigration Judge's July 12, 2019, Decision [ECF No. 45-19]; Immigration Judge's December 10, 2018, Decision [ECF No. 43-25]; Charges of Inadmissibility/Deportability [ECF No. 45-27]. Ultimately, however, USCIS found that Fagan "has not established by a preponderance of the evidence that he acquired lawful permanent resident status on any other date prior to the age of 18[.]"

Immigration Judge's July 12, 2019, Decision at 7. Fagan appealed, but the BIA likewise "agreed with the latest Immigration Judge's conclusion that the DHS has established the respondent's alienage by clear and convincing evidence for the reasons outlined in the Immigration Judge's decision[.]" BIA December 20, 2019, Decision.

### STANDARD OF REVIEW

When a party objects to a report and recommendation, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b)(3). "A general objection, or one that merely restates the arguments previously presented, is not sufficient to alert the court to alleged errors on the part of the magistrate judge. An objection that does *nothing more than state a disagreement* with a magistrate's suggested resolution, or *simply summarizes what has been presented before*, is not an 'objection' as that term is used in this context." *VanDiver v. Martin*, 304 F. Supp. 2d 934, 937–38 (E.D. Mich. 2004)) (emphasis in original); *cf. Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings."). "Objections to a magistrate judge's recommendation and report must be specific and clear enough to permit the district court to effectively review the magistrate judge's ruling." *Knezevich v. Ptomey*, 761 F. App'x 904, 906 (11th Cir. 2019) (cleaned up).

To accept a portion of the R&R to which no party objects, we "need only satisfy [ourselves] that there is no clear error on the face of the record[.]" FED. R. CIV. P. 72(b)(3) advisory committee's notes (citation omitted).[6]

---

[6] As we said, clear-error review is extremely deferential. Clear error is "more than just maybe or probably wrong"; it's error that "strike[s] us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).

## THE LAW

### I.       Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate  the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for

summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, we must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, we must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## II.     Derivative Citizenship

"A child acquires derivative citizenship by operation of law, not by adjudication. No application is filed, no hearing is conducted, and no certificate is issued when such citizenship is acquired. If [Fagan] obtained derivative citizenship in [1986 when his mother was naturalized], he did not have to take any further action to secure his citizenship." *Belleri v. United States*, 712 F.3d 543, 545 (11th Cir. 2013) (cleaned up). Fagan's case "centers on whether he achieved 'derivative citizenship.' This type of citizenship is derived by a child after birth through the naturalization of a parent. Claims of derivative citizenship prior to February 27, 2001 were governed by the former Section 321(a) of the Immigration and Nationality Act." *United States v. Forey-Quintero*, 626 F.3d 1323, 1325 (11th Cir. 2010). "Because this provision was in effect when [Fagan's] mother naturalized, it governs [his] claim for citizenship in this matter." *Claver v. U.S. Att'y Gen.*, 245 F. App'x 904, 905 (11th Cir. 2007).

"Former section 321(a) of the INA provided that a 'child born outside of the United States of alien parents' automatically became a citizen of the United States upon the fulfillment of the following conditions:

    (1) The naturalization of both parents; or

    (2) The naturalization of the surviving parent if one of the parents is deceased; or

    (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child is born out of wedlock and the paternity of the child has not been established by legitimation; **and if**

    (4) Such naturalization takes place while such child is unmarried and under the age of eighteen; **and**

    (5) Such child is residing in the United States pursuant to lawful admission for permanent residence at the time of the naturalization of the parent naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the Unites States while under the age of eighteen years.

*Forey-Quintero*, 626 F.3d at 1326 (emphasis added) (citing 8 U.S.C. § 1432(a) (1994)).[7]

In the Eleventh Circuit, the phrase "'begins to reside permanently in the United States while under the age of eighteen years,' when considered in light of the definitions of 'permanent' and 'residence' and the realities of the immigration laws of this country, is most reasonably interpreted to mean that the alien must acquire lawful permanent resident status while under the age of 18 years. In other words, a dwelling place cannot be 'permanent' under the immigration laws if it is unauthorized." *Id.* at 1327. In Fagan's case, this means that, for him to have become a U.S. citizen, he must have obtained lawful permanent resident status—not simply lawful entry—before his eighteenth birthday.

"American citizenship is a precious right." *Costello v. United States*, 365 U.S. 265, 269 (1961). In reviewing a claim for citizenship, "the burden is on the alien applicant to show his eligibility for citizenship in every respect," and all "doubts should be resolved in favor of the United States and against the claimant." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967) (cleaned up). "[T]o establish

---

[7] Under 8 U.S.C. § 1432(a) (1994), a child must meet the demands of one of subsections (1), (2) or (3), **and then** he or she must ***also*** fulfill the requirements of *both* subsections (4) *and* (5).

that she was lawfully admitted for permanent residence, [an alien] must do more than simply show that she was granted [lawful permanent resident] status; she must further demonstrate that the grant of that status was in substantive compliance with the immigration laws." *Injeti v. U.S. Citizenship & Immigr. Servs.*, 737 F.3d 311, 316 (11th Cir. 2013). "To qualify for naturalization," therefore, "an applicant must establish that he was lawfully admitted to the United States as a permanent resident in accordance with all applicable provisions of the INA." *United States v. Zhong*, 2013 WL 4647418, at *9 (N.D. Cal. 2013) (citing 8 U.S.C. § 1429). Notably, "all grants of LPR status that were not in substantive compliance with the immigration laws [are] void *ab initio*." *Kyong Ho Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010).

## ANALYSIS

As we've said, a party serving written objections to a report and recommendation must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made, the specific basis for such objections, and supporting legal authority." S.D. FLA. L. MAG. R. 4(B). But Fagan's Objections aren't specific. They rarely identify proposed findings. They cite no *supporting* caselaw. And they "simply summarize[ ] what has been presented before, [which] is not an 'objection'" to the R&R. *VanDiver*, 304 F. Supp. 2d at 398. Still, "[f]ilings by *pro se* litigants are construed liberally." *United States v. Wilson*, 515 F. App'x 877, 880 (11th Cir. 2013). So, we'll accept Fagan's Objections to the extent he *actually* objects to the R&R and doesn't simply re-assert the arguments he advanced in his MSJ.

Magistrate Judge Reinhart determined that "Ms. DeHaney got naturalized in 1986." R&R at 14. "At that point," the Magistrate Judge found, "to get derivative citizenship under the former 8 U.S.C. § 1432, Mr. Fagan had to meet two final requirements, (1) be under eighteen and (2) be a lawful permanent resident." *Ibid.* In other words, as the Magistrate Judge explained, "Mr. Fagan had until February 23, 1987, to meet the final two requirements." *Ibid.* Magistrate Judge Reinhart ultimately

concluded that Fagan "arrived in the United States as a visitor in 1976." *Id.* at 13–14. Judge Reinhart then found that Fagan "turned 18 in February 1987" and "became a permanent resident in January 1988." *Id.* at 14. In Judge Reinhart's view, therefore, Fagan "was a year too late" because, when he received permanent resident status on January 29, 1988, "he was over the age of eighteen. His permanent resident application approval notice and his temporary permanent resident card both say so." *Id.* at 14.

Fagan objects to Magistrate Judge Reinhart's conclusions that he (1) was "admitted on a B-2 visa that expired on April 3,1976," Objections at 7 (citing R&R at 8), and (2) "became a permanent resident on January 29, 1988," *id.* at 3 (citing R&R at 19). Fagan also objects (*see id.* at 19) to the Magistrate Judge's finding that, "[b]y the time he applied for and received permanent resident status, he was already over eighteen. At that point he no longer qualified to derive citizenship from his mother," R&R at 19. In essence, Fagan contends that he "was statutorily presumed to be entitled to 'follow-to-join' his mother, who was admitted as a lawful permanent resident in 1974," Objections at 12—and, therefore, that "his status as a lawful permanent resident has been conclusively established since 1976" when he first arrived in the United States, *id.* at 34.

In Fagan's view, the "only question before the Court in this proceeding is whether the date on his [2010 LPR Card] issued on November 16, 2010 contained a 'typographical error' as contended by the Defendant." *Id.* at 2–3. But that's not really the question we must answer today. What matters is whether Fagan became an LPR before his eighteenth birthday. *See* 8 U.S.C. § 1432(a)(5) (1994) ("A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions": "Such child is residing in the United States pursuant to lawful admission for permanent residence at the time of the naturalization of the Parent naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.").

If he did, then he automatically became a citizen of the United States through the process of derivative citizenship. *See Belleri*, 712 F.3d at 545 ("A child acquires derivative citizenship by operation of law, not by adjudication."). But if he didn't become an LPR until after his eighteenth birthday, then he never became a U.S. citizen through derivative citizenship because he didn't satisfy the requirements for derivative citizenship under the then-operative provisions of the INA. *See* 8 U.S.C. § 1432(a) (1994).

One more thing. "To qualify for naturalization, an applicant must establish that he was lawfully admitted to the United States as a permanent resident in accordance with all applicable provisions of the INA." *Zhong*, 2013 WL 4647418, at *9 (citing 8 U.S.C. § 1429); *see also Injeti*, 737 F.3d at 316 ("[T]o establish that she was lawfully admitted for permanent residence, [an alien] must do more than simply show that she was granted [lawful permanent resident] status; she must further demonstrate that the grant of that status was in substantive compliance with the immigration laws."). "According to 8 U.S.C. § 1101(a)(20), 'lawfully admitted for permanent residence' is 'the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]'" *Savoury v. U.S. Atty. Gen.*, 449 F.3d 1307, 1313 (11th Cir. 2006) (quoting 8 U.S.C. § 1101(a)(20)); *see also Matter of Longstaff*, 716 F.2d 1439, 1441 (5th Cir. 1983) ("The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity."); Black's Law Dictionary 902 (8th ed. 2004) (defining "lawful" as "[n]ot contrary to law; permitted by law"). "The adverb 'lawfully' requires more than the absence of fraud. It requires consistency with all applicable law." *Savoury*, 449 F.3d at 1313.

So, "[w]hether an alien is 'lawfully' admitted for permanent residence is an issue of law." *Zhong*, 2013 WL 4647418, at *9 (citing *Monet v. INS*, 791 F.2d 752, 753 (9th Cir. 1986)); *see also Monet*, 791 F.2d at 753 ("The issue presented here—whether . . . petitioner was never 'lawfully' admitted for permanent residence within the meaning of section 1182(c)—is a question of law."). The questions at

issue in this case, therefore—*viz.*, whether Fagan was admitted as an LPR in 1976, became an LPR in 1988, or adjusted his status at any point in between—are questions of law we can (and should) decide at summary judgment *if* the underlying facts are undisputed. *See Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) ("When the only question a court must decide is a question of law, summary judgment may be granted[.]").

## I.        How a Noncitizen Becomes an LPR: An Overview

"To be admitted to the United States, a noncitizen typically needs a visa." *Dep't of State v. Muñoz*, 602 U.S. 899, 903 (2024). "Congress has streamlined the visa process for noncitizens with immediate relatives in the United States." *Id.* at 904. The term "'immediate relatives' of a United States citizen, include[s] 'children, spouses, and parents[.]'" *Saheb v. Allen*, 2025 WL 1912443, at *1 (N.D. Ga. Mar. 11, 2025) (Ray, II, J.) (quoting 8 U.S.C. § 1151(b)(2)(A)(i)). "Issuance of a visa to an immediate relative occurs in several steps. First, the citizen relative files a Form I-130 petition with [USCIS][8] to have the noncitizen classified as an immediate relative." *Ibid.*; *see also Muñoz*, 602 U.S. at 904 ("The citizen-relative must first file a petition with [USCIS], an agency housed within the Department of Homeland Security, to have the noncitizen classified as an immediate relative." (cleaned up)). "If USCIS approves the petition, then the noncitizen may apply for a visa." *Muñoz*, 604 U.S. at 94 (citing 8 U.S.C. §§ 1201(a), 1202(a)); *see also Petition for Alien Relative Form I-130*, USCIS, https://www.uscis.gov/i-130 (July 8, 2025) ("We will generally approve your Form I-130 if you can

---

[8] We generally refer to the Government's immigration agency as "USCIS." But Fagan's immigration story spans over fifty years—and in those fifty years the agency has changed names. *See Our* History, USCIS, Our History | USCIS (last accessed Nov. 3, 2025). From 1976 to 2003, the relevant agency was called "the Immigration and Naturalization Service" ("INS"). *See ibid.* "INS oversaw the immigration process, enforcement, and border patrol activities for 70 years until Congress passed the Homeland Security Act of 2002." *Ibid.* "On March 1, 2003, [USCIS] assumed responsibility for the immigration service functions of the federal government." *Ibid.* Although these name changes don't affect our analysis, we'll take judicial notice of them anyway. *See Setai Hotel*, 2017 WL 3503371, at *7 (recognizing that a court may take "judicial notice of information publically [sic] available from an official government website").

establish a qualifying relationship between you and your relative that allows them to immigrate to the United States. Generally, after we approve the petition, your relative may apply for a Green Card.").[9] But "that approval results not in getting a visa then and there, but only in getting a place in line." *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 47–48 (2014). "As a consequence, the principal beneficiary of an approved petition is placed in a queue with others in her category (F1, F2A, or what have you) in order of 'priority date'—that is, the date a petition was filed with USCIS." *Id.* at 48. But "[t]he case is different for 'immediate relatives' of U.S. citizens, who can apply for and receive a visa as soon as a sponsoring petition is approved." *Ibid.* "[I]mmediate relatives" thus don't have a "priority date." *Ibid.*

"[A]n alien who is already in the United States must submit a written application (Form I-485) for adjustment of status to that of lawful permanent resident." *Asrat v. Barr*, 399 F. Supp. 3d 505, 517 (E.D. Va. 2019), *aff'd sub nom. Asrat v. Taylor*, 836 F. App'x 153 (4th Cir. 2021) (citing 8 U.S.C. § 1255(a)).[10] "If the application is approved, the applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status." 8 C.F.R. § 245.2. "Adjustment of status refers to the process of changing from a nonimmigrant to a lawfully admitted permanent resident[.]" *Tulsiyan v. Jaddou*, 2023 WL 4879913, at *3 (S.D. Fla. July 26, 2023) (Martinez, J.), *appeal dismissed sub nom. Tulsiyan v. Dir., US Citizenship & Immigr. Servs.*, 2024 WL 5087224 (11th Cir. Dec. 9, 2024). In sum, as Judge Graham (of our Court) has explained:

> One way to obtain an immigrant visa is for a United States citizen to file an I-130 Application and assert that the alien is his or her immediate relative under INA § 201(b)(2)(A)(I). Aliens with immediate relative status are exempt from direct numerical limitations when acquiring LPR. If the USCIS approves the I-130 Petition and the alien's status, it then can approve the I-485 application. This approval, which is within the discretion of the USCIS, results in the conferral of LPR status.

---

[9] Again, under Rule 201, we "may take judicial notice of government publications and website materials." *Coastal Wellness Ctrs.*, 309 F. Supp. 3d at 1220 n.4.

[10] "Form I-485, Application to Register Permanent Residence or Adjust Status, is for a person in the United States to apply for lawful permanent resident status (often referred to as a 'Green Card')." *Form I-485, Instructions for Application to Register Permanent Residence or Adjust Status*, USCIS, https://www.uscis.gov/i-485 (Sept. 24, 2025); *see also Coastal Wellness Ctrs.*, 309 F. Supp. 3d at 1220 n.4.

*MacLean v. Napolitano*, 2009 WL 10668501, at *3 (S.D. Fla. Sept. 25, 2009) (Graham, J.) (first citing *Taing v. Chertoff*, 526 F. Supp. 2d 177, 181–82 (D. Mass. 2007); and then citing *Richards v. Napolitano*, 643 F. Supp. 2d 118, 124 (E.D.N.Y 2009)).

So, what does all this mean for Fagan? *First*, when Ms. DeHaney naturalized on April 29, 1985, *see* Joint SOF ¶ 10, Fagan became an "immediate relative" of a U.S. Citizen, *see* 8 U.S.C. § 1151(b)(2)(A)(i). At that point, Fagan could begin the process of "adjusting" his status from noncitizen to LPR by having his mother, Ms. DeHaney, "the citizen-relative file[ ] a Form I-130 petition with [the Government] to have [Fagan] classified as an immediate relative." *Saheb*, 2025 WL 1912443, at *1. The parties agree that Ms. DeHaney filed that petition, *see* Joint SOF ¶ 13, and that INS[11] approved it, *see* 1985 Approval of Form I-130 ("The visa petition you filed has been approved. . . . Whether the beneficiary gets a visa is decided on when an application is made to a consular officer, whether the beneficiary is admitted or adjusts status in the United States is decided only when an application is made to an immigration officer."). *Second*, because Fagan was an "'immediate relative[ ]' of [a] U.S. citizen[ ]," he could "apply for and receive a visa as soon as [his] sponsoring petition [was] approved." *Scialabba*, 573 U.S. at 48. Fagan thus didn't need a "priority date" because he didn't have to wait for a visa to become available. *See ibid.* Ms. DeHaney, on Fagan's behalf, took that next step on January 30, 1987, when she applied for LPR status for him by filing a Form I-485. *See* 1988 Form I-485 LPR Application. *Third*, when INS approved the application Ms. DeHaney filed on Fagan's behalf, Fagan "adjusted" to LPR status on January 29, 1988. *See* 1988 LPR Approval; *see also* 8 C.F.R. § 245.2 ("If the application is approved, the applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status."). The problem for Fagan is that January 29, 1988, is almost a year *after* his eighteenth birthday (February 1987).

---

[11] Recall that INS is the predecessor to USCIS. *See supra* note 8.

## II.     Fagan's 2010 LPR Card Objection

According to Fagan, "[t]he record clearly demonstrates that Mr. Fagan properly filed a Form 1-90, Application to Replace Permanent Resident Card, on September 17, 2010," and (again, according to Fagan) the 2010 LPR Card—the replacement card he received on November 16, 2010—"correctly reflected the true basis of his lawful permanent resident status dating back to January 20, 1976." Objections at 2–3; *see also* Joint SOF ¶ 25 ("The replacement green card issued to Fagan on November 16, 2010, states 'Resident Since 01/20/1976.'"). Based on the 2010 LPR Card, Fagan "respectfully requests that the Court reject the findings of the Report and Recommendation related to his adjustment of status and reaffirm his lawful permanent resident status as of January 20, 1976." *Id.* at 7.[12] Unfortunately for Fagan, we agree with Magistrate Judge Reinhart that, "even in the light most favorable to Mr. Fagan, a reasonable jury could not conclude that this replacement permanent resident card proves that he became a permanent resident on January 20, 1976." R&R at 18.

Recall that Fagan's objection—that his 2010 LPR Card "correctly reflected the true basis of his lawful permanent resident status dating back to January 20, 1976," Objections at 2–3—*doesn't* create a dispute of *fact*. In assessing whether a "claim that [the plaintiff] was granted LPR status is a factual allegation, or a legal conclusion couched as a factual allegation," we "assume the truth of [the plaintiff's] factual allegations," but do not "assume the truth of [his] legal assertion that the facts as alleged had the legal effect of 'adjusting' [his] LPR status within the meaning of the . . . statute and regulation." *Sharkey v. Quarantillo*, 541 F.3d 75, 83 n.8 (2d Cir. 2008); *see also Singh v. U.S. Att'y Gen.*, 785 F. App'x 808 (11th Cir. 2019) ("Eligibility for adjustment of status, which includes the admissibility determination, is a reviewable legal conclusion."); *Reganit v. Sec'y, Dep't of Homeland Sec.*,

---

[12] Fagan's good-faith belief that he properly adjusted his status is irrelevant because the alleged "lack of substantive compliance [is] evaluated wholly without reference to the good faith of the alien applicant." *Kim v. Johnson*, 2016 WL 48090, at *7 (N.D. Cal. 2016) (citing *Segura v. Holder*, 605 F.3d 1063, 1066–67 (9th Cir. 2010)); *see also Lai Haw Wong v. INS*, 474 F.2d 739, 742 (9th Cir. 1973) (holding that a "mistaken admission conferred no status, permanent resident or otherwise").

814 F.3d 1253, 1257 (11th Cir. 2016) (holding that "an alien whose status was mistakenly adjusted to that of a lawful permanent resident was not an alien lawfully admitted for that purpose"). Viewed this way, Fagan's assertions don't create a material dispute of *fact* because the parties *agree* on what the 2010 LPR Card says. *See* Joint SOF ¶ 25 ("The replacement green card issued to Fagan on November 16, 2010, states 'Resident Since 01/20/1976.'"). They simply disagree about the Card's *legal* effect. So, we'll accept the truth of Fagan's factual allegations—that his 2010 LPR Card says that he's a "Resident Since 01/20/1976"[13]—but won't assume the truth of his "legal assertion that the facts as alleged had the legal effect of 'adjusting' [his LPR status]." *Sharkey*, 541 F.3d at 83 n.8.

Remember too that, "[t]o qualify for naturalization, an applicant must establish that he was lawfully admitted to the United States as a permanent resident in accordance with all applicable provisions of the INA." *Zhong*, 2013 WL 4647418, at *9 (citing 8 U.S.C. § 1429). Our Circuit has made clear that "'lawfully admitted' means more than admitted in a procedurally regular fashion. It means more than that the right forms were stamped in the right places. It means that the alien's admission to the status was in compliance with the substantive requirements of the law. **What is lawful depends on the law and not on administrative inadvertence or error**. The BIA can no more amend or vary a statutory requirement through negligence or mistake than it can do so intentionally in deliberate defiance of a congressional mandate." *Savoury*, 449 F.3d at 1317 (emphasis added). In other words, Fagan must show that the phrase "Resident Since 01/20/1976" on his 2010 LPR Card reflects the *correct* date of his adjustment of status—not merely "administrative inadvertence or error." *Ibid.* Put another way, he must show that his alleged admission on January 20, 1976 "was in compliance with the substantive requirements of the law." *Ibid.*

---

[13] Besides, the parties stipulated to this fact. *See* Joint SOF ¶ 25 ("The replacement green card issued to Fagan on November 16, 2010, states 'Resident Since: 01/20/1976.'").

And that's where Fagan falters because he hasn't produced *any* evidence that he applied (let alone that he was approved) for adjustment of status back in 1976. And the law is clear that, "[i]n order for an alien to adjust status to that of a lawful permanent resident, the alien must . . . apply for adjustment of status[.]" *Reganit*, 814 F.3d at 1257; *Dong Sik Kwon v. Immigr. & Naturalization Serv.*, 646 F.2d 909, 912 (5th Cir. 1981) ("[T]o qualify for a change of status . . . the alien must apply for this adjustment[.]"). Applying for adjustment is thus a procedural requirement Fagan hasn't shown he's ever satisfied.

"[T]he statement that 'lawfully' means 'substantive compliance with the requirements for admission to permanent residence and not *mere* procedural regularity' implies that procedural regularity *is required in addition* to substantive compliance with the legal requirements." *United States v. Jasmin Becker*, 2021 WL 4498649, at *10 (C.D. Cal. Apr. 12, 2021) (citing *Matter of Longstaff*, 716 F.2d at 1441 ("The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity.")). We therefore conclude that the 2010 LPR Card—"the document[ ] USCIS erroneously issued"—"did not accord lawful permanent resident status on [Fagan] in the absence of an adjudication and approval of [his] application by USCIS," *Asrat*, 399 F. Supp. 3d at 516–17, because the approval of his application was a "procedural regularity" Fagan needed to comply with in order to adjust his status, *see Reganit*, 814 F.3d at 1257. As in *Asrat*, "the undisputed record evidence also plainly demonstrates that USCIS did not in fact ever adjudicate or approve [an] application for [Fagan's] adjustment of status" on January 20, 1976. 399 F. Supp. 3d at 517. Without evidence that his application was "adjudicated and approved," in short, Fagan cannot show that he was admitted and adjusted in 1976 with "procedural regularity[.]" *Savoury*, 449 F.3d at 1317.

In fact, as we'll see below, the evidence is clear that Fagan *never* applied for LPR status until his mother submitted, on his behalf, his 1988 Form I-485 LPR Application, which the immigration officer approved on "January 29, 1988." 1988 Form I-485 LPR Application (including a "January 29,

1988" date stamp in the "COMPLETED – Approved" box); *see also* 1988 LPR Approval (providing "temporary evidence of lawful admission for permanent residence valid until July 28, 1988"). As a result of *that* application, the immigration authorities sent Fagan his *first* LPR card—the 1988 LPR Card—which unambiguously reveals an "Adjustment Date" of "01 29 1988[.]" 1988 LPR Card.

We're therefore satisfied that the 2010 LPR Card was "an administrative inadvertence or error," which *doesn't* (standing alone) show that Fagan was admitted "in compliance with the substantive requirements of the law[.]" *Savoury*, 449 F.3d at 1317; *see also Kim v. Johnson*, 2016 WL 48090, at *7 (N.D. Cal. 2016) (holding that, "when USCIS provides an immigration benefit that does not accord with substantive law, the benefit is never 'lawfully' provided"). Again, Fagan hasn't produced any evidence that he applied for adjustment of status in 1976—much less has he shown that any such application was adjudicated and approved. And that absence of evidence is fatal to his claim.[14] *See Breaux v. NCL (Bahamas) Ltd.*, 2022 WL 2304254, at *8 (S.D. Fla. June 24, 2022) (Altman, J.) ("*No* evidence (it goes without saying) isn't enough to withstand summary judgment."); *Wills v. Walmart Assocs., Inc.*, 592 F.Supp.3d 1203, 1220 n.6 (S.D. Fla. Mar. 22, 2022) (Altman, J.) ("[S]peculation isn't enough to survive summary judgment."); *Harrell v. City of Opa-Locka*, 2022 WL 898565, at *20 (S.D. Fla. Mar. 28, 2022) (Altman, J.) ("[A]t summary judgment, a plaintiff must produce *evidence* to support her contention[s.]"); *Nat'l Health Fin. DM, LLC v. Sea Spine Orthopedic Inst., LLC*, 2022 WL 2065045, at *8 (S.D. Fla. June 8, 2022) (Altman, J.) ("And *no evidence* isn't enough to survive summary judgment"). Fagan asks us to allow a USCIS officer to "amend or vary a statutory requirement through negligence or mistake"—and, in so doing, to sanction the "deliberate defiance of a congressional mandate." *Savoury*, 449 F.3d at 1317. We won't be doing that. We therefore reject Fagan's claim that the 1976 date on his 2010 LPR Card proves that he's been an LPR since January 20, 1976.

---

[14] Again, "the burden is on the alien applicant to show his eligibility for citizenship in every respect," and all "doubts should be resolved in favor of the United States and against the claimant." *Berenyi*, 385 U.S. at 637 (1967).

### III.    Fagan's LPR-Application Objection

Fagan next "objects to the [finding] that he 'received approval for lawful permanent residence on January 29, 1988,'" because "this conclusion misinterprets the evidence and overlooks material facts that clearly demonstrate that Mr. Fagan's [1988 Form I-485 LPR Application] was never properly adjudicated or approved[.]" Objections at 3 (citing R&R at 10); *see also ibid.* ("The record lacks any official documentation showing proper adjudication of Mr. Fagan's [1988 Form I-485 LPR Application] under section 245(a)." (citing 1988 Form I-485 LPR Application)). Fagan alleges that his 1988 Form I-485 LPR Application "does not contain the required approval stamp in security ink in the Action Block, as mandated by both statute and USCIS procedure." *Id.* at 4. For two reasons, we don't think this objection helps Fagan.

*First*, Fagan doesn't explain why he thinks his 1988 Form I-485 LPR Application "was never properly adjudicated or approved[.]" *Id.* at 3. As we explained above, "if the USCIS officer adjudicating [an] application for adjustment of status [ ] approve[s] the application, the officer would [ ] 'stamp[ ] the action block with his or her approval stamp and approved 'security' ink.'" *Asrat*, 399 F. Supp. 3d at 505. So, Fagan must show that his 1988 Form I-485 LPR Application didn't contain the "stamp [in] the action block with his or her approval stamp and approved 'security ink.'" *Ibid.* The only piece of evidence Fagan adduces for the proposition that INS never properly approved his 1988 Form I-485 LPR Application is the application itself. *See* Objections at 3–7. But that application *does* include a "January 29, 1988" date stamp in the "COMPLETED – Approved" box. 1988 Form I-485 LPR Application. "[T]he stamp [on a Form I-485] is a symbol that immigration authorities have favorably adjudicated an application to adjust status, and in the absence of 'countervailing evidence' the stamp itself can be used to verify a claim of permanent residence." *Krasilych v. Holder*, 583 F.3d 962, 967 (7th Cir. 2009) (citing 8 C.F.R. § 103.2(b)(17)); *cf. Sharkey*, 541 F.3d at 80 n.5 ("Sharkey appears to argue that she derived LPR status from the placement of the stamp on the passport, even if the placement

of the stamp was inadvertent. On this theory, the mere existence of the stamp might create LPR status, even if the officer reviewing her case decided not to adjust her status. Sharkey offers no support for this latter theory and the cited regulation provides none. The theory has no merit: if the agency can show, through 'countervailing evidence,' 8 C.F.R. § 103.2(b)(17), that the officer reviewing her case decided not to adjust her status, then Sharkey's status was not adjusted."). Fagan's 1988 LPR Approval *also* includes the phrase "Approved Jan 29 1988," along with the signature of the immigration officer who approved his application—"Angela E. Kohn"—in the "Date of Action" box.[15] Fagan fails to present *any* "countervailing evidence" for his view that his application was somehow *not* approved. All the record evidence, in short, supports the Government's position that Fagan's 1988 Form I-485 LPR Application *was* "properly adjudicated and approved."

*Second*, the 1988 Form I-485 LPR Application is the only complete permanent resident application in Fagan's immigration file. So, if that application *wasn't* properly adjudicated, then Fagan would have *no* viable claim even to LPR status—much less to citizenship.

We therefore overrule Fagan's LPR-Application objection.

## IV.     Fagan's B-2-Visitor-Visa Objection

Fagan next objects to the R&R's finding that he was "admitted on a B-2 Visa that expired on April 3, 1976." Objections at 7 (citing R&R at 8). Fagan argues that "the circumstances surrounding his admission, particularly the purported issuance and use of a B-2 visitor visa, are unsupported by any credible documentation." *Ibid.* (citing Joint SOF ¶¶ 8–9). In support of this objection, Fagan advances two main points. *First*, he insists that "[t]he Government's reliance on an incomplete Form I-94, which lists 'Granville, St. James, Jamaica' as his place of residence, does not satisfy the statutory

---

[15] Again, the 1988 LPR Card—which Fagan only received *because* the government approved his 1988 Form I-485 LPR Application—likewise reveals an "Adjustment Date" of "01 29 1988[.]" 1988 LPR Card.

requirements necessary for a non-immigrant admission under 8 U.S.C. [§ ]1101(a)(15)(B)."[16] *Id.* at 7.

According to Fagan, "[t]he record does not demonstrate that Mr. Fagan met the eligibility

requirements for B-2 status, specifically the requirement to have a foreign residence with no intention

of abandoning it and a temporary stay for pleasure, as defined under 8 U.S.C. § 1101(a)(15)(B)." *Id.* at

8. "On the contrary," he says, "the undisputed fact that Mr. Fagan has resided continuously in the

United States since his arrival in 1976 without ever departing clearly contradicts the notion of a

temporary stay." *Id.* at 9.

      Here, Fagan's right about law. *See Melian v. I.N.S.*, 987 F.2d 1521, 1523 (11th Cir. 1993). As

the Eleventh Circuit explained in *Melian*:

> For an alien's domicile to be considered "lawful," he must at least comply with this country's
> immigration laws. The Immigration and Nationality Act expressly requires that an alien
> admitted on a B–2 visa have a residence in a foreign country which he has no intention of
> abandoning and that he be visiting the United States temporarily for business or temporarily
> for pleasure. In other words, to be a lawful B–2 alien, a person must have an intent not to seek
> domicile in the United States. Thus, if aliens are here for a temporary purpose, they cannot
> establish domicile. Conversely, if they intend to stay, they violate the terms of their admission
> and are no longer here lawfully.

*Ibid.* (cleaned up) (first citing *Lok v. INS*, 681 F.2d 107, 109 (2d Cir. 1982); then citing 8 U.S.C.

§ 1101(a)(15)(B); then citing *Elkins v. Moreno*, 435 U.S. 647, 666 (1978); and then citing *Castillo–Felix v.*

*INS*, 601 F.2d 459, 464 (9th Cir. 1979)). If Fagan "intend[ed] to stay" when he entered the United

---

[16] That statute provides, in relevant part, as follows:

> The term "immigrant" means every alien except an alien who is within one of the following
> classes of nonimmigrant aliens: . . .

> (B) [A]n alien (other than one coming for the purpose of study or of performing skilled or
> unskilled labor or as a representative of foreign press, radio, film, or other foreign information
> media coming to engage in such vocation) having a residence in a foreign country which he
> has no intention of abandoning and who is visiting the United States temporarily for business
> or temporarily for pleasure[.]

8 U.S.C. § 1101(a)(15).

States on his B-2 Visitor Visa, then he "violate[d] the terms of [his] admission and [was] no longer here lawfully." *Castillo–Felix*, 601 F.2d at 464.

The problem with Fagan's argument is that he (again) undermines his own position here. After all, the Form I-94 Record, which indicates that Fagan entered on a B-2 Visitor Visa, is the *only evidence* Fagan has that he entered the United States *with authorization*. By attacking the validity of *that* visa, then, Fagan is left without *any proof* that he's *ever* been authorized to enter the United States. Recognizing this problem, Fagan says that, if he didn't enter the country on the B-2 Visitor Visa, then he *must* have entered as an LPR. *See* Objections at 11 ("The record before this Court does not demonstrate the satisfaction of the Attorney General that Mr. Fagan was not inadmissible under any provision of this chapter as a non-immigrant, to overcome the statutory presumption that Mr. Fagan is an immigrant."). As we've explained however, aside from the erroneous date on his 2010 LPR Card—for which Fagan has been able to adduce no evidence of "substantive compliance" or "procedural regularity"—Fagan has no evidence to support this claim. And it's well-settled that the absence of evidence is not enough to survive a motion for summary judgment. In the end, all the record evidence supports Magistrate Judge Reinhart's finding that Fagan was "admitted on a B-2 Visa that expired on April 3, 1976." R&R at 8; *see also* Form I-94 Record (stamped "ADMITTED B-2 (CLASS) UNTIL 4/3/76"); 1988 Form I-485 LPR Application (Q: "In what status did you last enter the U.S.?" [Fagan, answering under penalty of perjury]: "Visitor"); Form N-600 Application for Certificate of Citizenship (listing "Date of Entry" into the United States as "01/20/1976"); *ibid.* (answering "UNKNOWN BECAUSE APPLICANT WAS SIX YEAR OLD CHILD AT THE TIME OF ADMISSION" to the question: "I used the following travel document to be admitted to the United States").

*Second*, Fagan claims that "[t]here is no record of such admission in the Non-Immigrant Information System (NIIS)[17] confirming that Mr. Fagan was issued a B-2 visa or admitted as a B-2 visitor." Objections at 8; *see also* R&R at 13 (confirming that, "when Mr. Fagan did arrive to the United States, he entered on a B-2 visitor visa that expired on April 3, 1976"). "In fact," Fagan adds, "a search of the NIIS system yielded no non-immigrant admission record for Mr. Fagan, which is documented by a system printout affirmatively indicating the absence of any such record." Objections at 8. In saying so, Fagan alleges that "an official entry in the [Central Index System] CIS[18] shows that the 'B2' action date is listed as '00/00/00,' underscoring the lack of evidence that Mr. Fagan was ever admitted as a non-immigrant." *Ibid.* (cleaned up). Again, we disagree.

As we've detailed, Fagan's Form I-94 Record shows that, on "Jan 20 1976," he was "ADMITTED" as a "B-2 CLASS UNTIL 4/3/76." That an unaffiliated government clerk—with no relationship to Fagan or involvement in his case—*later* entered his information (without a proper date) into a CIS database does nothing to alter the plain English words of the Form I-94 Record. And

---

[17] "The NIIS was a database of records tracking the arrival and departure of individuals as nonimmigrant visitors. *See* 68 FED. REG. 5,048 (Jan. 31, 2003). Since early in 2005, the NIIS has been integrated into the Treasury Enforcement Communications System maintained by the United States Customs and Border Protection." *Tariq v. Keisler*, 505 F.3d 650, 654 (7th Cir. 2007) (first citing Elizabeth M. Grieco, *Estimates of the Nonimmigrant Population in the United States: 2004*, OFF. OF IMMIGR. STAT., at 1, NIM_2004_3.indd (2006); and then citing *Privacy Impact Assessment Update of the United States Visitor and Immigrant Status Indicator Technology Program* (US-VISIT), U.S. DEP'T OF HOMELAND SEC., at 3, Department of Homeland Security Privacy Impact Assessment for Adding I-94 Data to the Arrival and Departure Information System (2007)).

[18] The Department of Homeland Security defines the CIS as "a repository of electronic data that contains an index of basic data elements related to an individual as he or she passes through the immigration process. CIS contains information on the status of applicants and petitioners seeking immigrant and non-immigrant benefits, including: lawful permanent residents, naturalized citizens, United States border crossers, aliens who illegally entered the United States, aliens who have been issued employment authorization documents, individuals who petitioned for benefits on behalf of family members, and other individuals subject to the provisions of the Immigration and Nationality Act (INA)." *DHS/USCIS/PIA - 009 Central Index System*, DEP'T OF HOMELAND SEC., DHS/USCIS/PIA 009 Central Index System | Homeland Security (Mar. 31, 2023).

Fagan's "conclusory assertions to the contrary, in the absence of supporting evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

In short, Magistrate Judge Reinhart correctly found that, "when Mr. Fagan did arrive to the United States, he entered on a B-2 visitor visa that expired on April 3, 1976," *see* R&R at 13, and that "the undisputed facts do not show that he 'followed to join'" his mother, Ms. DeHaney, *id.* at 12. We therefore overrule Fagan's B-2-Visa objection.

## V.    Fagan's Western-Hemisphere-Program Objection

Fagan next "challenges the claim that he could not have derived permanent resident status from his mother in 1976 because he did not apply for, nor receive, such status under the [Western Hemisphere Program ('WHP')] at that time." Objections at 11 (citing R&R at 13–14). Fagan says that he "became classified as the child of a permanent resident on May 29, 1985," and that he "became eligible to apply for permanent resident status on June 10, 1985." *Ibid.*[19]

Under the WHP, "citizens of 'independent' Western Hemisphere countries desiring to immigrate to the United States were defined as 'special immigrants,' were not categorized by a priority or preference system, and were admitted on a first-come first-served basis without a per-country quota." *Angeles v. Johnson*, 121 F. Supp. 3d 997, 1002 (S.D. Cal. 2015) (citing H.R. REP. 94–1553 (1976)); *see generally* H.R. REP. 94–1553, reprinted in 1976 U.S.C.C.A.N. 6073 (summarizing the WHP and its 1976 amendment by Pub. L. No. 94-571, 90 STAT. 2703). "The single restriction on prospective Western Hemisphere immigrants entering to perform skilled or unskilled labor was to obtain a certification from the Secretary of Labor indicating that his or her entry will not adversely affect the United States labor market." *Angeles*, 121 F. Supp. 3d at 1002–03. Children of those "special

---

[19] In saying that he applied for LPR adjustment in 1985, Fagan undermines the principal claim he advances in his 2010-LPR-Card Objection, which is that he first came to the United States as an LPR in 1976.

immigrants" received the same benefit *if* they were "accompanying or following to join" their parent. INA §§ 101(a)(27), 212(a)(14) (1965).

On this issue, Magistrate Judge Reinhart agreed that "Mr. Fagan's mother immigrated to the United States under the WHP in 1974." R&R at 12. Still, the Magistrate Judge concluded that "even viewed in the light most favorable to Mr. Fagan, the undisputed facts do not show that he 'followed to join' her." *Ibid.* In fact, as the Magistrate Judge noted, "Ms. DeHaney's visa application says the opposite, that Mr. Fagan would not be following to join her." *Ibid.*

Here, again, the Magistrate Judge was right. Nothing in the record justifies Fagan's claim that he applied for (and received) an immigrant visa "following to join" his mother, who had entered the United States in 1974 *without* Fagan. *See generally* DeHaney Visa Application (listing, in Box 14, "Neil Sean DeHaney" under "Names and addresses of children under 21 years of age" and noting, in Box 15, that "[p]erson(s) named in 14 (will not) accompany or follow me to the United States"); Joint SOF ¶¶ 7–8 (stipulating that "Ms. DeHaney was admitted for lawful permanent resident . . . on April 20, 1974" and that "Mr. Fagan arrived . . . on January 20, 1976"); Fagan SOF ¶ 20 ("Mr. Fagan entered the United States on January 20, 1976, by plane at Miami International Airport, accompanied by his aunt Beryl Laird."). Recall that Fagan's mother, Ms. DeHaney, made clear in her own visa application that her son (Fagan) would *not* accompany or follow her to the United States. *See* DeHaney Visa Application. Had Fagan—or his mother applying on his behalf—wanted to file an immigrant visa application, she could have said as much by making clear in Box 15 of her visa application that Fagan "*will* accompany or follow me to the United States." *Ibid.* (emphasis added). Similarly, Fagan (or Ms. DeHaney on his behalf) *could* have filed an application for LPR status—in which case Fagan *may* have received a visa under the WHP. But Fagan hasn't adduced any evidence that he *ever* received any such WHP visa. And that absence of evidence is fatal to his claim. *See Breaux*, 2022 WL 2304254, at *8 ("*No evidence (it goes without saying) isn't enough to withstand summary judgment.*").

What the record *does* make clear is that Fagan was admitted in 1976 on his B-2 Visitor Visa—as his Form I-94 Record unambiguously shows. *See* Form I-94 Record ("ADMITTED B-2 (CLASS) UNTIL 4/3/76").[20] After Fagan, who was now in the United States, had overstayed his visitor visa by *more* than *nine* years, "Ms. DeHaney submitted a relative immigrant visa petition for Mr. Fagan on April 29, 1985." Joint SOF ¶ 13.[21] But this request wasn't an application for adjustment to LPR status. Remember that "an alien who is already in the United States must submit a written application (Form I-485) for adjustment of status to that of lawful permanent resident." *Asrat*, 399 F. Supp. 3d at 517. And Fagan's 1985 Approval of Form I-130, which the immigration authorities issued when they approved the immigrant visa petition Ms. DeHaney filed on Fagan's behalf, said as much. *See* 1985 Approval of Form I-130 ("The visa petition you filed has been approved. The beneficiary for whom you filed has been given the appropriate classification. Note the approval gives no assurance that the beneficiary will automatically be found eligible for visa issuance, admission to the United States or adjustment to lawful permanent resident status. Whether the beneficiary gets a visa is decided on when an application is made to a consular officer, whether the beneficiary is admitted or adjusts status in the United States is decided only when an application is made to an immigration officer.").

But, of course, the record reveals that he never filed any such application until he submitted his Form I-485 "Application for Permanent Residence" in 1988. *See* 1988 Form I-485 LPR

---

[20] Ms. DeHaney entered the United States on an SA-1 visa. *See* DeHaney Immigrant Visa and Alien Registration (showing a "Classification Symbol" of "SA-1" and a "foreign State/Other Area Limitation" in the "Western Hemisphere"). Had Fagan entered the United States as a "child of alien classified SA-1," his entry visa would have read "SA-3[.]" *See* 22 C.F.R. § 42.12 ("The following symbols shall be used in cases of aliens who are special immigrants" and listing the "Symbol to be inserted in visa" for "Alien born in independent Western Hemisphere country" as "SA-1" and "Child of alien classified SA-1" as "SA-3").

[21] "Mr. Fagan's alien file does not contain the original filed petition or any copy of it." Joint SOF ¶ 13. But, because the parties have stipulated to the petition's existence, we'll accept this fact without the original. *See Christian Leal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 677–78 (2010) ("[F]actual stipulations are formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact[.]").

Application. In that application—signed under penalty of perjury—Fagan wrote "Jan. 20, 1976" when asked "On what date did you last enter the U.S." *Id.* at 2. And Fagan notably answered that he was a "Visitor" in response to the question: "In what status did you last enter the U.S.?" *Ibid.* He did not, in short, claim that he was a "lawful resident" (or anything else we might reasonably construe as a claim to LPR status).

Magistrate Judge Reinhart thus correctly concluded that "Fagan could not have derived permanent resident status from his mother in 1976, because he did not apply for nor receive permanent resident status in 1976 under the WHP." R&R at 19. "His arrival record, his petition for relative immigrant visa, and his application for permanent residence all confirm that he did not arrive in 1976 under the WHP program. He entered as a temporary visitor." *Id.* at 13.

Trying to parry, Fagan insists that, "[b]y operation of law, Mr. Fagan's statutory entitlement to immigrant status automatically triggered various regulatory provisions, including 22 C.F.R. § 42.63 (1967), which explicitly states that the registration of a principal applicant, such as Ms. DeHaney, automatically includes any children the applicant may have or acquire, regardless of whether the child was specifically named in the application." Objections at 13.

True, that regulation—now abolished—once provided that the "registration of an application" of the principal alien (here, Ms. DeHaney) "on the qualified waiting list shall be considered as automatically including any spouse he may have or may subsequently acquire and any such child such applicant or his spouse may have or may subsequently acquire, regardless of whether such spouse or child was specifically named in his application for determination of qualifications." 22 C.F.R. § 42.63 (1967). But § 42.63 applied *only* to the INA's "Numerical Controls" programs—a set of regulations that created quotas for certain immigrants from *non*-Western-Hemisphere countries. And, by definition, "immigrants born in the Western Hemisphere [were] exempt from the numerical limitations on entry." *Gooch v. Clark*, 433 F.2d 74, 84 (9th Cir. 1970); *see also De Avila v. Civiletti*, 643

F.2d 471, 473 (7th Cir. 1981) ("Western Hemisphere immigrants were defined as 'special immigrants,' and were not subject to any annual per country quota."); *Faustino v. Immigr. & Nat. Serv.*, 432 F.2d 429, 430 (2d Cir. 1970) (referring to "Numerical Controls" as "the numerical limitations imposed on immigrants other than those from the Western Hemisphere"); *United States v. Sanchez-Garcia*, 98 F.4th 90, 94 (4th Cir. 2024) ("[T]he national origin quotas did not apply to immigrants from Western Hemisphere countries."); *Angeles*, 121 F. Supp. 3d at 1002 ("[C]itizens of 'independent' Western Hemisphere countries desiring to immigrate to the United States were defined as 'special immigrants,' were not categorized by a priority or preference system, and were admitted on a first-come first-served basis without a per-country quota."). In other words, the automatic-registration provision of § 42.63 allowed the children of immigrants from *non*-Western-Hemisphere countries to *automatically* receive their parents' place in the proverbial line to register for admission to the United States under the INA's now-abolished quota system. But none of that has anything to do with Fagan because he was born *in* the Western Hemisphere (Jamaica)—and so, these provisions, which govern the quota systems that applied to immigrants born *outside* the Western Hemisphere, simply don't apply to him.

We therefore overrule Fagan's WHP Objection.

## VI.   Fagan's Saving-Clause Objection

Citing the "savings clause" of the INA amendments of 1976, Fagan asks us to find "that upon Ms. DeHaney's naturalization on July 3, 1986, the approved immigrant visa petition that had been deemed filed as of April 11, 1974, under the Savings Clause, was automatically converted to an immediate relative petition (IR1), thereby entitling Mr. Fagan to immediate classification as the child of a U.S. citizen." Objections at 21. Fagan argues that "the R&R failed to consider the effect of the

Western Hemisphere Savings Clause in preserving Fagan's entitlement to immigrant status[.]" *Id.* at 26. Here, again, Fagan misses his mark.

"In October of 1976 the immigration laws were amended." *Solis-Ramirez v. U.S. Dep't of Just.*, 758 F.2d 1426, 1428 (11th Cir. 1985) (citing INA (1976), Pub. L. No. 94–571, § 6, 90 Stat. 2703, 2705–06). "Under the new law immigrants from the Western Hemisphere and the rest of the world are treated equally. All are subject to the same preference classification system." *Ibid.* (citing 8 U.S.C. § 1153(a) (1982)). "Immigrants from the Western Hemisphere who had acquired priority dates under the old law were integrated into the preference system by a 'savings clause.'" *Ibid.*

> This [savings] clause provides that such immigrants will retain their old priority date and will be classified as non-preference (Section 203(a)(8)) immigrants until another classification is acquired: [Aliens from the Western Hemisphere] who established a priority date at a consular office on the basis of entitlement to immigrant status under statutory or regulatory provisions in existence on the day before the effective date of this Act shall be deemed to be entitled to immigrant status under section 203(a)(8) of the Immigration and Nationality Act and shall be accorded the priority date previously established by him. Nothing in this section shall be construed to preclude the acquisition by such an alien of a preference status under section 203(a) of the Immigration and Nationality Act, as amended by section 4 of this Act. Any petition filed by, or in behalf of, such an alien to accord him a preference status under section 203(a) shall, upon approval, be deemed to have been filed as of the priority date previously established by such alien . . . .

*Id.* at 1428–29 (quoting INA of 1976 § 9(b)). "Accordingly, under the new laws, [a WHP immigrant] was classified as a non-preference immigrant with a priority date of August 5, 1976."[22] *Ibid.* But none of this means that Fagan became an *LPR* on August 5, 1976 (or, as he sometimes suggests, April 11, 1974).

Recall that an "approved [I-130] petition is placed in a queue . . . in order of 'priority date,'" with visas "becoming available in order of priority date." *Scialabba*, 573 U.S. at 48. The "priority date" establishes the order in which a visa becomes available to a noncitizen who has filed an approved petition—not the date on which a noncitizen becomes an LPR. *See Li v. Renaud*, 709 F. Supp. 2d 230,

---

[22] That's "the day before the effective date" of the INA amendments. *See* INA § 9(b) (1976).

232 (S.D.N.Y. 2010), *aff'd*, 654 F.3d 376 (2d Cir. 2011) ("To keep the visa process orderly while approved Beneficiaries await permission to enter the United States, the USCIS assigns Beneficiaries priority dates ('Priority Dates'). A Priority Date is, in effect, a place on a waiting line."); *see also Visa Availability and Priority Dates*, USCIS, Visa Availability and Priority Dates | USCIS (Jan. 24, 2025) ( "[The Department of State] uses the priority date to determine an immigrant's place in the visa queue."). Again, though, Fagan didn't need a "priority date." As the child of a U.S. Citizen, Fagan was *immediately* eligible to apply for LPR status—by filing a Form I-485—*as soon as* his Form I-130 was approved (which in his case happened on May 29, 1985). *See Scialabba*, 573 U.S. at 48 (noting that "'immediate relatives' of U.S. citizens [ ] can apply for and receive a visa as soon as a sponsoring petition is approved"); *see also* Joint SOF ¶ 14 ("The immigrant visa petition was approved on May 29, 1985.").

Regardless of his "priority date," then, Fagan became an LPR on the day his I-485 application was approved. *See* 8 C.F.R. § 245.2 ("[T]he applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status[.]"). And our record reveals that the *only* Form I-485 Fagan ever filed was his 1988 Form I-485 LPR Application. Based on that application, Fagan became an LPR on January 29, 1988. *See* 1988 Form I-485 LPR Application (showing a "January 29, 1988" date stamp in the "COMPLETED – Approved" box). Since Fagan thus didn't become an LPR until 1988, we agree with Magistrate Judge Reinhart that "Fagan could not have derived permanent resident status from his mother in 1976, because he did not apply for nor receive permanent resident status in 1976 under the WHP." R&R at 19.

We therefore overrule Fagan's savings-clause Objection.

**VII.    Fagan's Regulatory Objections**

Finally, Fagan contends that he "was eligible for the presumption of lawful admission for permanent residence under 8 C.F.R. § 101.2, which provides for the presumption of lawful admission

when errors, such as an incorrect name, appear on an individual's admission record." Objections at 26. Here, Fagan argues that, "as an immigrant child who entered the United States on January 20, 1976, as the dependent of a lawful permanent resident (his mother, Ms. Amy DeHaney), [he] would have been presumed to have been lawfully admitted—despite any discrepancies in his records— provided that he could establish the accuracy of the claimed date of admission by clear, unequivocal, and convincing evidence." *Ibid.* Fagan also cites 8 C.F.R. § 264.2 for the proposition that "[t]he registration procedures for creating a record of lawful permanent residence under 8 C.F.R. § 101.2 are described in 8 C.F.R. § 264.2." *Ibid.* But that's just not what these regulations say.

Starting with 8 C.F.R. § 101.2, that regulation establishes a limited presumption of lawful admission "when an alien otherwise admissible . . . [enters under] an incorrect name, sex, name of relative, or name of foreign place of birth or residence, provided that he establishes by clear, unequivocal, and convincing evidence that the record of the claimed admission relates to him." Fagan says that, although "the adjudicating officer stamped [his 1988 Form I-485] 'APPROVED' under the section titled 'COMPLETED' on January 29, 1988," under § 101.2, "the presumption of lawful admission should have been applied as of Mr. Fagan's original date of entry on January 20, 1976." Objections at 28. But Fagan hasn't suggested that his entry record reflects an "incorrect name, sex, name of relative, or name of foreign place of birth or residence"—which is a prerequisite to relief under § 101.2.

Two more things on this regulation before we move on. *First,* even if Fagan had argued that his entry record reflected an "incorrect name of foreign birth or residence" (because his Form I-94 Record listed his address as "Granville, St. James, Jamaica," Objections at 7–9), we'd still overrule this objection. Fagan admits that he was born in Jamaica. *See* Joint SOF ¶ 1 ("Neil Fagan (Mr. Fagan) was born in Jamaica on February 24, 1969."). And there's no evidence *either* that Fagan wasn't born in "Granville, St. James, Jamaica" *or* that he didn't reside there before he arrived in the United States.

34

*Second*, under § 101.2, the presumption of "having been lawfully admitted" *only* applies to "[a]n alien otherwise admissible"—that is, aliens who would be admissible *but for* the error. Again, Fagan hasn't shown that he was "otherwise admissible" to the United States on January 20, 1976.

And 8 C.F.R. § 264.2 simply allows "[a]n applicant who believes that he/she is eligible for presumption of lawful admission for permanent residence under § 101.1 or § 101.2 of this chapter or . . . under § 101.3 of this chapter [to] submit his/her application for creation of a record of lawful permanent residence on Form I–485[.]" 8 C.F.R. § 264.2(a). For § 264.2 to apply, though, Fagan must qualify for a presumption of lawful admission under §§ 101.1, 101.2, or 101.3. But Fagan hasn't even alleged that he qualifies under § 101.1 or § 101.3,[23] and we just explained why § 101.2 doesn't apply to him.

Since these regulations don't apply to Fagan's case, we overrule this final objection.

## CONCLUSION

The record reveals that Fagan didn't become an LPR until 1988. *See* 1988 LPR Approval (including a stamp marking Fagan as "Approved Jan 29 1988" in the "Date of Action" box). He entered the United States in 1976 on a "B-2 visitor visa," which allowed him to stay in the country for three months. *See* B-2 Visitor Visa (showing that Fagan entered on "Jan 20 1976 ADMITTED B-2

---

[23] In any event, our review of these regulations makes clear that neither § 101.1 nor § 101.3 saves Fagan here. The former (§ 101.1) applies to noncitizens who were admitted in certain places and times—all *before* 1957. *See* 8 U.S.C. § 101.1 (listing admittance: (a) "prior to June 30, 1906"; (b) via "United States land borders" under certain conditions, all before "July 1, 1924"; (c) to "the Virgin Islands of the United States prior to July 1, 1938"; (d) of "an alien who establishes he is of a race indigenous to, and a native of a country within, the Asiatic zone . . . . prior to 1924"; (e) of "Chinese and Japanese aliens" under certain conditions before "December 16, 1943"; (f) of "Citizens of the Philippine Islands" under certain conditions before "July 3, 1946"; (g) of "Temporarily admitted aliens" before "June 3, 1921"; (h) of "Citizens of the Trust Territory of the Pacific Islands who entered Guam prior to December 24, 1952"; (i) of "Aliens admitted to Guam" before 'December 24, 1952'; and (j) the "Erroneous admission as United States citizens or as children of citizens" under various conditions, all before "September 11, 1957"). Fagan doesn't suggest that he entered the United States at any of the places § 101.1 identifies—and he wasn't even born before 1957—so that section can have no application here. And § 101.3 applies only to a "[p]erson born to [a] foreign diplomat," 8 U.S.C. § 101.3, which Fagan doesn't suggest he qualifies for.

CLASS UNTIL 4/3/76"). But that visitor visa didn't confer LPR status. *See Melian*, 987 F.2d at 1523 (noting that, to be "a lawful B–2 alien, a person must have in intent not to seek domicile in the United States"); *see also Visitor Visas*, U.S. DEP'T. OF STATE ("Visitor visas are nonimmigrant visas for persons who want to enter the United States temporarily . . . for tourism (B-2 visa)[.]"). And, while Fagan *could have* applied for LPR status through his mother, he's failed to produce any evidence that he did so before 1987.

In sum, under former INA § 321(a), to receive derivative citizenship from his mother, Fagan had to become an LPR before his eighteenth birthday (February 24, 1987). *See Forey-Quintero*, 626 F.3d at 1326. Unfortunately for Fagan, there's simply no evidence that he did. Fagan thus hasn't shown that he's a citizen of the United States through derivate citizenship. Since "the burden is on the alien applicant to show his eligibility for citizenship in every respect," and because all "doubts should be resolved in favor of the United States and against the claimant," *Berenyi*, 385 U.S. at 637 (1967), we affirm the R&R and enter summary judgment for the Government.

\*   \*   \*

After careful review of the R&R, Fagan's Objections, the record, and the governing law, we **ORDER** and **ADJUDGE** as follows:

1. Fagan's Objections to the Report and Recommendation [ECF No. 82] are **OVERRULED**.

2. The Report and Recommendation [ECF No. 63] is **ADOPTED** and **APPROVED**.

3. Fagan's Motion for Summary Judgment [ECF No. 48] is **DENIED**.

4. The Government's Motion for Summary Judgment [ECF No. 49] is **GRANTED**.

5. The Clerk of Court shall **CLOSE** this case. All other pending motions are **DENIED as moot**. And all other deadlines are **TERMINATED**.

**DONE AND ORDERED** in the Southern District of Florida on November 12, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record